IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PEACE SOFTWARE, INC., a Delaware Corporation, | ) ) ) | CIV. NO. 09-00408 SOM/LEK |
| Plaintiff, | ) ) | ORDER DENYING COUNTERCLAIM-DEFENDANT'S |
| vs. | ) ) | MOTIONS TO DISMISS TORTIOUS INTERFERENCE WITH CONTRACT |
| HAWAIIAN ELECTRIC COMPANY, INC., a Hawaii Corporation, | ) ) ) | CLAIM AND TO STRIKE PRAYER FOR PUNITIVE DAMAGES |
| Defendant. | ) ) | |
| HAWAIIAN ELECTRIC COMPANY, INC., a Hawaii corporation, | ) ) ) | |
| Counterclaimant, | ) ) | |
| vs. | ) ) | |
| PEACE SOFTWARE, INC., a Delaware corporation, and FIRST DATA CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Counterclaim Defendants. | ) ) | |
| _____ ) | | |

ORDER DENYING COUNTERCLAIM-DEFENDANT'S
MOTIONS TO DISMISS TORTIOUS INTERFERENCE WITH CONTRACT
CLAIM AND TO STRIKE PRAYER FOR PUNITIVE DAMAGES

I.      INTRODUCTION.

        This case concerns the scope of software and services

that Plaintiff Peace Software, Inc., was required to provide to

Defendant Hawaiian Electric Company, Inc., by contract.  Peace

alleges that, among other things, HECO breached the contract.

HECO counterclaims that Peace's former parent company,

Counterclaim Defendant First Data Corporation, intentionally

interfered with Peace's contract with HECO, causing Peace to be unable to perform its contractual obligations.  Before the court are First Data's motions to dismiss HECO's tortious interference with contractual relations counterclaim and to correspondingly strike HECO's prayer for punitive damages.  The court denies First Data's motions.  HECO has sufficiently pled a tortious interference with contractual relations claim.

II.      BACKGROUND.

In 2004, HECO sought approval from the Hawaii Public Utility Commission to implement a new Customer Information System.  Countercl. ¶¶ 6-12; see Peace Software, Inc., v. Hawaiian Elec. Co., No. 09-00408, 2009 WL 3923350, at *1 (D. Haw. Nov. 17, 2009) (describing the alleged events).  A new Customer Information System was expected to improve, among other things, HECO's management of its customer accounts, products, and services.  Countercl. ¶¶ 11-12.  On May 5, 2005, the Public Utility Commission approved the project.  Id. ¶ 20.

On March 10, 2006, HECO and Peace allegedly entered into a contract that required Peace to install a Customer Information System for HECO.  Id. ¶ 19.  That same day, HECO allegedly entered into a contract with Peace's parent company, Peace Software North America Limited.  Id. ¶ 13.

Four months later, in July 2006, First Data allegedly acquired Peace and Peace's parent company.  Id. ¶ 23.

2

Allegedly, First Data's acquisition of Peace had a negative effect on Peace's ability to perform its obligations under the Peace-HECO contract.  Id. ¶ 28.  HECO alleges that Peace missed deadlines for installing the Customer Information System.  Id. ¶¶ 28, 31.  HECO says, "Peace and First Data began to ignore and bypass the terms of the [contract and began to conduct] themselves as though they were not bound by its terms."  Id. ¶ 31.

On April 18, 2007, HECO allegedly entered into a contract with First Data Utilities for software compatible with the Peace Customer Information System.  Id. ¶ 22.  Although HECO alleges that First Data Corporation operated Peace under the name First Data Utilities, it appears that First Data Utilities, which contracted with HECO on April 18, 2007, is a First Data Corporation subsidiary separately incorporated.

HECO says that Peace missed deadlines, released subpar software, and performed below expectations.  Id. ¶¶ 29-35.  In June 2008, HECO accused Peace of having materially breached the Peace-HECO contract.  However, HECO did not terminate that contract.  Id. ¶ 38.

In October 2008, Hansen Information Technologies, Inc., acquired Peace and Peace's parent company from First Data. Id. ¶ 24.  Peace is now a Hansen subsidiary.  Id. ¶ 25.

HECO alleges that, notwithstanding First Data's sale of Peace to Hansen, First Data "retained control of the [Peace-HECO contract] and remained actively involved with the [Customer Information System]." Id. ¶ 26. First Data allegedly prohibited Hansen and/or Peace from communicating directly with HECO about the Peace-HECO contract. Id. ¶ 44. HECO claims that First Data directed Hansen to cancel a meeting with HECO's president to discuss Peace's performance. Id. In 2009, First Data allegedly demanded that HECO sign off on a "Revenue Classification and Reporting SDD" even though the Peace-HECO contract did not require the sign off. Id. ¶ 45. HECO says that its refusal to sign off on this SDD has brought the parties to "a standstill" that has "further delayed" the Customer Information System. Id. ¶ 50.

On August 31, 2009, Peace filed the present lawsuit asserting many claims, including breach of contract. On October 5, 2009, HECO filed a Counterclaim against First Data and Peace, asserting a breach of contract claim against Peace and a tortious interference with contractual relations claim against First Data. First Data moves to dismiss the tortious interference claim and to strike HECO's prayer for punitive damages.

III.       STANDARD OF REVIEW.

Dismissal under Rule 12(b)(6) may be based on either: (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal theory.  Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988) (citing Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984)).

On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss.  Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996).

IV.        ANALYSIS.

First Data argues that HECO has not properly pled tortious interference with contractual relations.  First Data also moves to strike HECO's prayer for punitive damages.  The court concludes that HECO's pleading is sufficient and declines to strike HECO's prayer for punitive damages.

A.   HECO Has Sufficiently Pled Tortious Interference With
     Contractual Relations.

The elements of tortious interference with contractual relations are: (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of a third party to breach the contract; (4) the absence of justification on the defendant's part; (5) a breach of the contract by the third party; and (6) damages to the plaintiff.  Lee v. Aiu, 85 Haw. 19, 33, 936 P.2d 655, 668 (1997) (citing Weinberg v. Mauch, 78 Haw. 40, 50, 890 P.2d 277, 287 (1995)).  Because First Data concedes that HECO has properly pled the second element, the court does not address that element.  The court examines the other elements, which First Data argues are not sufficiently pled.

B.   HECO Sufficiently Alleges A Contract Between HECO and
     A Third Party.

The first element requires a contract between a plaintiff and a third party.  Lee, 85 Haw. at 32, 936 P.2d at 668.  Generally, a contracting party cannot be held liable in tort for interfering with its own contract.  Spring Patents, Inc. v. Avon Rubber & Plastics, Inc., 183 F. Supp. 2d 1198, 1210 n.11 (D. Haw. 2001).  In other words, if a plaintiff and a defendant form a contract, then the defendant usually cannot be liable in tort for interfering with that contract, although the

defendant may be liable for breach of that contract.  Applied
Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 459
(Cal. 1994).

          HECO, as Counterclaim Plaintiff, must allege a
contract with a party other than First Data, Counterclaim
Defendant.  HECO alleges that it entered into a contract with
Peace.  Countercl. ¶ 13.  First Data argues that it is a
"contracting party" or an indirect party to the Peace-HECO
contract, given its acquisition of Peace and its position for a
time as Peace's parent corporation.  Pointing to allegations in
HECO's Counterclaim suggesting that First Data is closely
related to Peace, First Data says it is a party to the contract
and thus cannot be liable for interference with the Peace-HECO
contract.  According to First Data, HECO's counterclaim fails
given HECO's allegation that First Data owned Peace for two out
of the three years the Peace-HECO contract has been in effect,
and because First Data exercised control over Peace thereafter.
This court disagrees.  Even if First Data and Peace are or were
closely related, closely related parties are not automatically
considered the same party for purposes of a claim of tortious
interference with contractual relations.

          Peace and HECO allegedly entered into a contract on
March 10, 2006.  Countercl. ¶ 13.  First Data acquired Peace in
July 2006.  Id. ¶ 23.  First Data argues that "a corporate

7

parent that owns a subsidiary that is a party to the contract and 'controls' the subsidiary's performance" should be deemed a party to the subsidiary's contracts for purposes of a tortious interference claim.  Reply at 3-4.  First Data points to HECO's allegations that First Data "retained control" over Peace and remained "actively involved" in implementing the Customer Installation System even after Peace was sold to Hansen. Countercl. ¶¶ 26, 43.  First Data says these allegations show that HECO is treating Peace and First Data as closely related parties.  Mot. at 6.  However, these allegations do not require the conclusion that a parent company necessarily stands in the subsidiary's shoes.  First Data did not *own* Peace at the time First Data was alleged to have exercised control over Peace and so was not in the position of a parent company.  Nor does First Data's alleged exercise of control over Peace automatically make First Data closely related to Peace, as the exercise of control may not have been lawful.

Nothing in HECO's Counterclaim suggests that First Data controlled Peace's performance to such an extent that First Data should be deemed a "party" to Peace's contract with HECO. Wholly owning a subsidiary for roughly two years does not automatically render First Data equivalent to the subsidiary for purposes of a tortious interference claim.  See Phil Crowley Steel Corp. v. Sharon Steel Corp., 702 F.2d 719, 722 (8th Cir.

1983) (holding that a parent's full ownership of a subsidiary corporation does not automatically insulate that parent company from liability for tortious interference under Missouri law). Common ownership among corporate defendants is not, by itself, a sufficient basis on which to deny liability.

Some courts have indicated that a parent company or stockholder cannot be liable for interfering with a subsidiary's contract with a third party if the parent's actions are justified.  These holdings imply that a parent company may be liable for tortious interference when the parent's actions are not justified.  See generally Deauville Corp. v. Federated Dep't Stores, Inc., 756 F.2d 1183, 1196-97 (5th Cir. 1985) (noting that a parent company with a wholly owned subsidiary was not liable for tortious interference when its actions flowed from a legitimate financial interest, such as stock ownership, superior to that of the contracting parties); Pure, Ltd. v. Shasta Beverages, Inc., 691 F. Supp. 1274, 1279 (D. Haw. 1988) (holding that a wholly owned subsidiary had alleged enough facts to support a tortious interference claim against its parent to withstand a motion to dismiss); Record Club of Am., Inc. v. United Artists Records, Inc., 611 F. Supp. 211, 217 (S.D.N.Y. 1985) (noting that a parent corporation that interfered with the contractual relationships of its wholly owned subsidiary was

liable for tortious interference when the parent corporation was motivated by malice or used fraudulent or illegal means).

The cases First Data relies on are distinguishable. First Data cites <u>Applied Equipment Corp. v. Litton Saudi Arabia Ltd.</u>, 869 P.2d 454 (Cal. 1994), as support for its argument that a parent and its subsidiary should be considered the same party for a tortious interference with contractual relations claim. The court indicated that only a "stranger to a contract" should be liable for tortious interference. <u>Id.</u> at 459. However, the actual holding of the case was limited. The plaintiff, Applied, had entered into a contract with the defendant, Litton. Applied, working on commission, was to procure equipment for Litton. <u>Id.</u> at 455. Applied ordered equipment from a third-party, Varian, and issued a purchase order, which Varian accepted and acknowledged. <u>Id.</u> at 455. To avoid paying Applied's commission, Litton entered into a contract with Varian to obtain the equipment directly. <u>Id.</u> at 456. Applied sued Litton and Varian, asserting that they had conspired to interfere with Litton's contract with Applied. The court held that Applied's conspiracy claim failed because it amounted to a claim of interference with its own contract (its purchase order contract with Varian), which could only be brought as a breach of contract claim. <u>Id.</u> at 461-62. However, in rejecting the conspiracy claim, the court noted, "Nothing we have said

10

suggests that Litton may not be held liable for direct
interference with the Applied/Varian purchase order (to which it
was not a party) or that Varian may not be held liable for
direct interference with the Applied/Litton subcontract (to
which it was not a party), provided that each of the elements of
the tort of interference with contract is satisfied." Id. at
463-64.  In short, Applied does not stand for any proposition
helpful to First Data.

   In referring to a "stranger to a contract," the
Applied court appeared to be referring to any "contracting
party."  See id. at 459 ("California recognizes a cause of
action against *noncontracting* parties who interfere with the
performance of a contract.  It has long been held that *a
stranger to a contract* may be liable in tort for interfering
with the performance of the contract.").  Thus, in Woods v. Fox
Broadcasting Sub., Inc., 28 Cal. Rptr. 3d 463, 470 (Cal. Ct.
App. 2005), the court said, "[W]e find it highly unlikely that
Applied Equipment intended to hold, or should be construed as
holding, that persons or entities with an ownership interest in
a corporation are automatically immune from liability for
interfering with their corporation's contractual obligations."

   First Data also cites ESI, Inc. v. Coastal Power
Production Co., 995 F. Supp. 419, 433 (S.D.N.Y. 1998).  In that
case, the court granted the defendant's motion to dismiss

11

because the plaintiff failed to allege that the plaintiff itself
was a party to the contract at issue.  The plaintiff clearly
could not sue for tortious interference with contractual
relations in the absence of a contract.  Here, by contrast, HECO
does allege that it is a party to the contract with Peace.
Countercl. ¶ 13.  The defendant in Coastal Power was a successor
in interest to an original contracting party.  995 F. Supp. at
433.  First Data, by contrast, is not Peace's successor, but an
entity that owned Peace, among other companies, for some time.

     First Data also cites Spring Patents, 183 F. Supp. 2d
at 1210 n.11, as support.  In that case, this court in a
footnote noted the possibility that a majority shareholder of a
company might be considered a contracting party for tortious
interference purposes.  However, the court declined to address
the issue.  The court cited Boulevard Associates v. Sovereign
Hotels, Inc., 72 F.3d 1029, 1037 (2d Cir. 1995), which held that
a parent company could not be liable for a tortious interference
claim when there was no evidence that it employed wrongful means
or intentionally intimidated its subsidiary into breaching its
contract with a third party.  This footnote discussion is
inapplicable here, as HECO alleges that First Data intentionally
caused Peace not to perform its obligations under the Peace-HECO
contract.  Countercl. ¶¶ 44, 45, 50.

In Baum v. United Cable Television Corporation of Eastern Connecticut, No. 90-044673, 1992 WL 175119, at *4 (Conn. Super. Ct. Jul. 20, 1992), the court said that "there can be no tortious interference of contract by someone who is directly or indirectly a party to a contract."  First Data neither cites any Hawaii case adopting this position nor persuades this court that HECO's allegations must be read as characterizing First Data as an indirect party.  The Baum decision did not delineate the boundaries of an "indirect party," and First Data does not explain why it should be deemed an indirect party even after it sold Peace.  This is important because HECO claims tortious interference by First Data even after First Data sold Peace to Hansen.  Countercl. ¶¶ 43-50.  First Data has not been a corporate parent for at least a year, from October 2008 to the present, during which time the Peace-HECO contract has remained in effect.[1]

While failing to point to any Hawaii law stating that an indirect party is a party to a contract for interference with contract purposes, First Data asks the court to rely on Buscher v. Boning, 114 Haw. 202, 216, 159 P.3d 814, 828 (2007).  That

---

[1] At most, HECO alleges, "Peace assigned its rights in and to the ISA to First Data or Hansen."  Countercl. ¶ 27.  This statement is so uncertain, suggesting as it does that any assignment may have been to Hansen only, that the court cannot read it as a factual assertion that First Data was Peace's assignee.

case held that a plaintiff could not maintain a tortious interference claim against a defendant that was a necessary party to a contract.  No one is alleging that First Data was a necessary party to the Peace-HECO contract.

At the hearing on the present motion, First Data argued that a parent or former parent's potential liability in tort for interfering with its subsidiary's contracts would diminish the parent's incentive to acquire other companies.  But a plaintiff must plead that the parent intentionally induced a party to breach its contract without proper justification. Arguably, a parent does not act without justification when it directs the subsidiary to breach a contract that it is no longer in the subsidiary's economic interest to perform.  See, e.g., Boulevard Assocs., 72 F.3d at 1036.  Mere status as a parent does not automatically invite claims.

C.   HECO Sufficiently Alleges That First Data Intentionally and Improperly Induced Peace to Breach the Peace-HECO Contract.

A plaintiff must allege the third element, that "the third party acted with intent and legal malice, i.e., the intentional doing of a harmful act without legal or social justification or excuse, or, in other words, the wilful violation of a known right." Meridian Mortg., Inc. v. First Hawaiian Bank, 109 Haw. 35, 45-46, 122 P.3d 1133, 1145-46 (Haw. Ct. App. 2005) (internal citations and italics omitted).  A

plaintiff must allege that the "defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact." <u>Bodell Const. Co. v. Ohio Pac. Tech., Inc.</u>, 458 F. Supp. 2d 1153, 1165 (D. Haw. 2006). However, merely asserting "one's rights to maximize economic interests does not create an inference of ill will or improper purpose." <u>Id.</u>

First Data argues that HECO has not alleged that First Data intentionally and improperly induced Peace to breach its contract with HECO. First Data says that HECO only alleges that First Data maximized its economic interest when it allegedly interfered with Peace and HECO's contractual relationship. This court disagrees.

Admittedly, HECO alleges that "First Data directed Peace to take actions that would reduce First Data's cost to the detriment of Peace's timely performance." Countercl. ¶ 49. This allegation suggests that First Data was attempting to maximize its own economic interest. However, HECO also alleges that First Data interfered after Hansen acquired Peace. Countercl. ¶¶ 43-50, 58. At that point, it is unclear what economic interest First Data had. First Data also allegedly has recently done things that have stalled implementation of the Customer Information System. <u>Id.</u> ¶ 50. If First Data retained no economic interest in the Peace-HECO contract once Peace was

15

sold to Hansen, it is unclear what economic motivation First Data had.

HECO also alleges that "First Data, with purposeful intent, interfered with Peace's ability to perform under the ISA, and its apparent control over Peace has induced Peace to breach the ISA." Countercl. ¶ 58. HECO further alleges, "First Data's conduct was knowing, intentional, willful, wanton, malicious, and done with deliberate indifference to the rights of HECO." Id. ¶ 60. These allegations, construed liberally, satisfy the third element.

> D. HECO Sufficiently Pleads First Data's Alleged Lack Of Justification for Interfering With the Peace-HECO Contract.

The fourth element, "that the defendant acted without proper justification, must be a part of the plaintiff's prima facie case." Kutcher v. Zimmerman, 87 Haw. 394, 406, 957 P.3d 1076, 1088 (Haw. Ct. App. 1998). Tortious, illegal, or unconstitutional interference, or actions that violate statutes, regulations, or recognized common-law rules or established standards of a trade or profession, may be unjustified. Id. at 407, 957 P.3d at 1089. Justification may be lacking when a defendant harbors improper motives or employs improper means. Id. at 404, 957 P.2d at 1086.

First Data argues that HECO must allege that First Data owed Peace a "duty of non-interference," and that "HECO

16

cannot establish that First Data owed Peace a 'duty of non-
interference' because First Data owned Peace" and retained
control even after selling Peace.  Mot. at 9.  HECO has
sufficiently pled this element, regardless of whether First Data
did or did not have a duty not to interfere.

The Oregon Supreme Court held that a defendant acted
wrongfully if it "interfered for an improper purpose rather than
for a legitimate one, or that defendant used improper means
which resulted in injury to plaintiff."  Uptown Heights Assocs.
Ltd. P'ship v. Seafirst Corp., 891 P.2d 639, 647 (Or. 1995).[2]
First Data appears to be arguing that HECO had to allege
interference for an improper purpose, or use of improper means.
Even if HECO had to so allege, HECO's allegations are
sufficient.  HECO alleges that First Data's interference was not
justified and was "knowing, intentional, willful, wanton,
malicious, and done with deliberate indifference to the rights
of HECO."  Countercl. ¶¶ 59-60.  Moreover, HECO's allegations
suggest that First Data interfered for an improper purpose, if
First Data lacked an economic interest in the Peace-HECO
contract after selling Peace to Hansen.  Countercl. ¶¶ 50, 58.

---

[2]The Uptown Heights analysis indicated that a party invoking
an express contractual remedy by proper means might not be liable
for intentional interference even if that party had a malevolent
reason for invoking the remedy.  891 P.2d at 652.  First Data
does not argue that it was a direct party to the Peace-HECO
contract or that it is invoking an express remedy.

17

The court reads all allegations in the light most favorable to HECO.  In that light, HECO's allegations suffice.

###### E.    HECO Sufficiently Alleges That Peace Breached The Peace-HECO Contract.

For the fifth element, a plaintiff must plead that the third party breached the plaintiff's contract with that third party.  Weinberg, 78 Haw. at 50, 890 P.2d at 287.  First Data notes that HECO is alleging that Peace breached the contract while Peace was wholly owned by First Data.  Mot. at 9-10.  First Data says that, as any alleged interference by First Data must have occurred after that breach, Peace's alleged breach cannot satisfy any element of a tortious interference claim against First Data.  However, the "argument that Defendants could not have induced a breach of an already breached contract is untenable."  Pure, 691 F. Supp. at 1280.  The Peace-HECO contract may have been valid and capable of interference by First Data, even if Peace had previously breached the contract.  Indeed, no one asserts that the contract was terminated at the moment of Peace's alleged breach.

First Data argues that Pure was decided "over 20 years ago" and "better-reasoned decisions" have established that a plaintiff must allege that a breaching party would have performed but for the defendant's tortious interference.  Reply at 11.  The "better reasoned" and "newer" decisions cited by

First Data are a 2002 Central District of California case and a 1977 California Court of Appeals case.  Reply at 11.

In Wynn v. National Broadcasting Company, Inc., 234 F. Supp. 2d 1067, 1121 (C.D. Cal. 2002), television writers sued broadcasting companies and talent agencies, alleging that the plaintiffs had been victims of a pattern or practice of age discrimination.  Id. at 1074.  The plaintiffs also asserted that the talent agencies had interfered with their contracts or job opportunities with the broadcasting companies.  The court held that the plaintiffs had not adequately pled tortious interference against the talent agencies, in part because the plaintiffs had failed to allege facts supporting causation.[3] Id. at 1121-22.  The court reasoned that the talent agencies could not have caused any contract breach because the plaintiffs could always have applied directly to the broadcasting companies.  Those plaintiffs who had applied directly to the broadcasting companies had not been hired.  Id.

Wynn does not require dismissal of HECO's tortious interference claim.  HECO's allegations imply that Peace would have performed had First Data not interfered.  Thus, HECO alleges that First Data "prevent[ed] Peace from performing" and that First Data prohibited "Hansen and/or Peace from

---

[3]The court also held that this claim was preempted and could not be brought against the broadcast companies, which were parties to the contract.  234 F. Supp. 2d at 1118.

19

communicating directly with HECO on matters relating to the
ISA." Countercl. ¶¶ 58, 45. <u>Wynn</u> involved allegations that the
plaintiffs who applied directly to the broadcasting companies
had not been hired.  Those allegations suggested that the talent
agencies that had allegedly interfered had not induced any
failure to hire by the broadcasting companies.  In short, the
allegations suggested that failure to hire would have resulted
with or without the agencies' alleged interference.  No
analogous allegations exist here.  HECO is not alleging that,
even absent interference by First Data, Peace would have
breached while owned by First Data.  To the contrary, HECO's
allegations suggest that Peace would have performed further
(even if Peace previously breached) but for First Data's
interference.  Countercl. ¶¶ 43-50.  In any event, <u>Wynn</u> neither
contradicts <u>Pure</u> nor concludes that a defendant is immune from a
tortious interference claim if a contracting party materially
breached its contract before the alleged interference but then
further breaches as a result of the defendant's alleged
interference.

        The second case First Data cites is <u>Dryden v. Tri-
Valley Growers</u>, 135 Cal. Rptr. 720, 724-25 (Cal. Ct. App. 1977).
In that case, the court held that the plaintiff could not
proceed with a tortious interference claim because the contract
was cancelled and rescinded before the alleged interference.

Id.  There is no allegation that the Peace-HECO contract was cancelled or rescinded before First Data's alleged interference.

      F.    HECO Has Sufficiently Pled Damages.

      For the sixth element, a plaintiff must allege that the breach caused the plaintiff to sustain damages.  Weinberg, 78 Haw. at 50, 890 P.2d at 287.  It is "of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses."  Id.

      First Data argues that HECO has failed to allege actual damages as a consequence of First Data's conduct.  This court disagrees.  HECO has alleged that First Data caused Peace to breach the Peace-HECO contract, and that, as a result, HECO has suffered damages.  Countercl. ¶¶ 50, 61.  HECO says that the damages stemmed from "unnecessary delays and added expense." Countercl. ¶ 45.  While it may be that HECO is merging delays and expenses resulting from Peace's alleged contract breach with damages resulting from First Data's alleged tortious interference, that is not a matter before this court on a motion to dismiss.  On the present motion, this court is examining the sufficiency of HECO's allegation, and HECO is alleging delays and damages resulting from First Data's actions.  Countercl. ¶ 45.

Finally, First Data argues that if "the Court agrees that HECO's claim is legally insufficient and dismisses the claim, First Data's motion to strike HECO's prayer for punitive damages should be granted."  Reply at 13.  Because HECO has sufficiently pled the elements of a tortious interference with contract claim, the court does not strike HECO's prayer for punitive damages.

V.        <u>CONCLUSION.</u>

The court denies First Data's motions to dismiss HECO's tortious interference with contractual relations claim and to strike HECO's prayer for punitive damages.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 22, 2010



_/s/ Susan Oki Mollway_____

Susan Oki Mollway
Chief United States District Judge

<u>Peace Software, Inc., v. Hawaiian Elec. Co., Inc.</u>, Civ. No. 09-00408, SOM/LEK
Order Denying Counterclaim-Defendant's Motions to Dismiss Tortious
Interference With Contract Claim and to Strike Prayer for Punitive Damages.

22